[Civ. No. 13038. Fourth Dist., Div. Two. Apr. 9, 1974.]

FRIENDS OF LAKE ARROWHEAD et al., Plaintiffs and Appellants, v. BOARD OF SUPERVISORS OF SAN BERNARDINO COUNTY et al., Defendants and Respondents;
MARVIN WILSON et al., Real Parties in Interest and Respondents.

498

**COUNSEL**

Young, Henrie & McCarthy and John C. McCarthy for Plaintiffs and Appellants.

Stanford D. Herlick, County Counsel, and Paul A. Grube, Jr., Deputy County Counsel, for Defendants and Respondents.

Alexander, Inman & Fine, Maurice C. Inman, Jr., Reid, Bryan Kravetz, Babbage & Coil, Enos C. Reid and Dennis M. Finn for Real Parties in Interest and Respondents.

## OPINION

**TAMURA, J.**—Plaintiffs instituted a proceeding in administrative mandamus to review and set aside actions of the County of San Bernardino approving three unrelated construction projects in the Lake Arrowhead area of the county. The main attack upon the projects was the alleged failure of the county to comply with requirements of the California Environmental Quality Act of 1970 (CEQA; Pub. Resources Code, § 21000 et seq.[1]). Plaintiffs appeal from the judgment and order denying the petition as to two of the projects, the Marvin Wilson and the Kaiser-Aetna projects.

Each project involves different facts and legal issues. We shall, therefore, consider them separately.

### WILSON PROJECT

Plaintiffs filed their initial petition on December 1, 1972. On December 15, 1972, they filed an amended petition which, insofar as the Wilson project was concerned, alleged in substance: On September 7, 1972, the county approved a tentative tract map for a planned development of 55 multiple residential units on a three-acre parcel owned by Wilson; on November 2, 1972, the county issued a grading permit; as of December 1, 1972, no building permit had been issued and construction had not commenced; the impact of the development would be detrimental to the surrounding environment; the county's actions were invalid in that no environmental impact report was made or considered or, if made, was inadequate; and the tentative tract map for the proposed development is inconsistent with the adopted general plan and zoning for the area, rendering its approval invalid.

Upon the filing of the amended petition, plaintiffs obtained a restraining order and an order to show cause re preliminary injunction. The county and Wilson answered the petition and filed a declaration and memorandum of authorities in opposition to the order to show cause. The matter was argued and submitted on the pleadings, declarations and record of the proceedings before the county planning commission.[2]

---

[1]Unless otherwise indicated all section references in this opinion are to the Public Resources Code.

[2]The court's minutes recite that the declaration filed by Wilson was received in evidence over plaintiffs' objection. Since plaintiffs do not complain of the propriety of the court's ruling, that issue is not before us. It should be noted, however, that while an application for a preliminary injunction may properly be determined on affidavits (see Code Civ. Proc., § 527), where factual issues are presented in a mandate proceeding, those issues should normally be resolved by the introduction of evidence according to rules governing ordinary civil trials. (See Cal. Administrative Mandamus (Cont.Ed. Bar) § 13.14, p. 225.)

The pertinent facts are not in dispute. Chronologically, they may be summarized as follows:

In the spring of 1972 Wilson commenced negotiations to acquire the three-acre parcel in question. A dilapidated 38-unit motel cottage complex which had been closed since October 1971 was located on the property. The property had been zoned R-3 for a number of years. Wilson employed a firm of engineers to prepare a site development plan for a 55-unit planned residential development and a tentative tract map.

On September 7, 1972, following a public hearing, the planning commission unanimously approved the tentative tract map and site development plan. Although two of the individual plaintiffs in the present action (Peter Lubisich, Jr., and Donald Burns) appeared at the planning commission hearing and voiced their objections to the tentative tract map, no appeal was taken by anyone from the planning commission decision.

On October 12, 1972, a grading plan and plans for the construction of a retaining wall were filed with the planning department. Permits for the work issued immediately thereafter.

On October 24, 1972, Wilson obtained a $2,900,000 construction loan for the project.

On October 27, 1972, the planning department made a finding that the project had a "non-significant effect" on the environment and accordingly determined that an environmental impact report (EIR) would not be required.

On November 6, 1972, Wilson began demolition of existing structures and thereafter graded the site and constructed the retaining wall. Land acquisition costs and the costs of the foregoing work exceeded $735,000. Prior to December 1, 1972, Wilson entered into binding contracts for construction and materials in excess of $900,000.

On November 27, 1972, the county issued a building permit for the construction of the project, and Wilson applied for a permit from the state Division of Highways for the construction of an access driveway to the development.

On December 4, 1972, Wilson submitted a final tract map to the county surveyor for review and approval.

On December 7, 1972, the county department of building and safety issued permits for electrical, plumbing and heating work.

Following the hearing, the court entered a minute order announcing its

intended decision to deny the application for preliminary injunction and to deny the petition for writ of mandate. Plaintiffs requested findings of fact and conclusions of law. The court thereupon made and entered an order denying the petition in which it found the facts recited above and concluded that the petition should be denied because (1) plaintiffs had failed to exhaust their administrative remedies; (2) the project had been confirmed and validated by the provisions of a 1972 urgency measure amending the CEQA (Stats. 1972, ch.1154, effective Dec. 5, 1972); and (3) plaintiffs had been guilty of laches.

Plaintiffs contend: (1) The court erred in concluding that plaintiffs failed to exhaust their administrative remedies; (2) the court erred in concluding that the project was validated by the 1972 urgency amendment to the CEQA; and (3) the tentative tract map was invalid in that it was in conflict with the adopted general plan and zoning for the area.

(a) *Exhaustion of Administrative Remedies*

It is settled that before one claiming to be aggrieved by a decision of an administrative agency may seek judicial relief, he must first exhaust his administrative remedies. (*Metcalf* v. *County of Los Angeles,* 24 Cal.2d 267, 269 [148 P.2d 645]; *Igna* v. *City of Baldwin Park,* 9 Cal.App.3d 909, 915 [88 Cal.Rptr. 581]; *Dunham* v. *City of Westminster,* 202 Cal. App.2d 245, 249-250 [20 Cal.Rptr. 772].) The court below took judicial notice of section 61.0222 of the San Bernardino County Code, which provides in pertinent part as follows: "Any order, requirement, decision, determination, interpretation of ruling made by the County Planning Commission in the administrative enforcement of the provisions of this Code, may be appealed therefrom to the Board of Supervisors by any person aggrieved, or by an officer, board, department or bureau of the County. . . ." The record of the planning commission proceeding in which the Wilson tentative tract map was approved shows that the two individual plaintiffs appeared at the public hearing but took no appeal from the planning commission decision. The court, therefore, concluded that plaintiffs failed to exhaust their administrative remedies.

Plaintiffs contend that the quoted county code provision was not intended to grant "any person aggrieved" the right to appeal a planning commission decision approving a tentative tract map and, more importantly, assuming it was so intended, it is in conflict with the Subdivision Map Act (Bus. & Prof. Code, § 11500 et seq.) and therefore invalid. Plaintiffs point to Business and Professions Code section 11552[3] which

---

[3]Subdivision (b) of section 11552 of Business and Professions Code provides: "(b) If the subdivider is dissatisfied with any action of the advisory agency with respect

gives the right of administrative appeal from a decision of the planning commission only to the subdivider who "is dissatisfied with any action of the advisory agency with respect to the tentative map, or the kinds, nature and extent of the improvements recommended by the advisory agency to be required, . . ." The section does not give a right of appeal to any interested or aggrieved person.

Plaintiffs urge that, except to the extent the Subdivision Map Act expressly or by necessary implication authorizes local agencies to enact supplemental ordinances, the state law preempts the field of subdivision regulation. They contend that the act does not authorize enactment of a local ordinance extending the right of appeal from an advisory agency

to the tentative map, or the kinds, nature and extent of the improvements recommended by the advisory agency to be required, he may within 15 days after such action, appeal to the governing body, unless an appeal board has been designated in which event such appeal must be to the appeal board, for a public hearing thereon. The governing body or appeal board as the case may be shall hear the appeal, upon notice to the subdivider and the advisory agency, unless the subdivider consents to a continuance, within 15 days or at its next succeeding regular meeting. At the time fixed for the hearing the governing body or appeal board shall proceed to hear the testimony of the subdivider or any witnesses in his behalf and the testimony of the representatives of the advisory agency or any witnesses in its behalf. It may also hear the testimony of other competent persons respecting the character of the neighborhood in which the subdivision is to be located, the kinds, nature and extent of improvements, the quality or kinds of development to which the area is best adapted and any other phase of the matter with respect to which it may desire to inquire into.

"Upon conclusion of the hearing the governing body or appeal board shall within seven days declare its findings based upon the testimony and documents produced before it. It may sustain, modify, reject or overrule any recommendations or rulings of the advisory agency and may make such findings as are not inconsistent with the provisions of this chapter or local ordinance adopted pursuant to this chapter.

"If the subdivider or advisory agency is dissatisfied with any action of the appeal board with respect to the tentative map, or the kinds, nature and extent of the improvements required by the appeal board, either may, within 15 days after such action, appeal to the governing body. The governing body shall hear the appeal within 15 days or at its next succeeding regular meeting, unless the subdivider consents to a continuance, and shall give notice of such hearing to the subdivider, the appeal board and the advisory agency. The governing body shall hear the argument of the subdivider, the appeal board and the advisory agency or of their representatives based on the testimony and the documents before the appeal board, and may receive documents from or hear the testimony of any competent person respecting the character of the neighborhood in which the subdivision is to be located, the kinds, nature and extent of improvements, the quality of kinds of development to which the area is best adapted and any other phase of the matter with respect to which it may desire to inquire into. Upon conclusion of the hearing the governing body shall within seven days, declare its findings based upon the testimony and documents produced before it or before the appeal board. It may sustain, modify, reject or overrule any recommendations or rulings of the appeal board and may make such findings as are not inconsistent with the provisions of this chapter or local ordinance adopted pursuant to this chapter."

decision on a tentative tract map to any aggrieved person. They therefore maintain that as dissatisfied members of the public they had no administrative remedy which they could have validly pursued.

 Local agencies are expressly empowered to enact certain types of supplemental ordinances. (E.g., Bus. & Prof. Code, §§ 11506, 11525 [controlling design and improvement]; Bus. & Prof. Code, § 11540.1 [regulating division of land not a subdivision]; Bus. & Prof. Code, §§ 11543.5, 11547 [prescribing fees as a condition of approval]; Bus. & Prof. Code, § 11546 [requiring dedication of land or payment of fees for park or recreational purposes]; Bus. & Prof. Code, § 11525.2 [requiring dedication of land for school purposes].) The power to adopt supplemental ordinances or regulations in connection with matters covered by the act, though not expressly granted, may also be implied provided they bear a reasonable relation to the purposes and requirements of the act and are not inconsistent with it. (*Ayres* v. *City Council of Los Angeles,* 34 Cal.2d 31, 37 [207 P.2d 1, 11 A.L.R.2d 503]; *Longridge Estates* v. *City of Los Angeles,* 183 Cal.App.2d 533, 539 [6 Cal.Rptr. 900]; *Mefford* v. *City of Tulare,* 102 Cal.App.2d 919, 925 [228 P.2d 847]; see *Kelber* v. *City of Upland,* 155 Cal.App.2d 631, 638 [318 P.2d 561].) But local ordinances which are inconsistent "with the language and apparent intent of the statute" are invalid. (*Kelber* v. *City of Upland, supra,* 155 Cal.App.2d 631, 638; *Santa Clara County Contractors etc. Assn.* v. *City of Santa Clara,* 232 Cal.App.2d 564, 573-575 [43 Cal.Rptr. 86]; *Newport Bldg. Corp.* v. *City of Santa Ana,* 210 Cal.App.2d 771, 776-777 [26 Cal.Rptr. 797].)

 From our analysis of the act, it is our conclusion that the county code, if construed as permitting *any* aggrieved person to appeal a planning commission decision approving a tentative tract map, would conflict with Business and Professions Code section 11552. The language of that section indicates the Legislature intended to preempt the subject matter of appeals from advisory agency decisions on tentative tract maps. It contains comprehensive provisions governing such appeals; it prescribes who may appeal and sets forth in detail the procedure to be followed, including the time within which such appeals must be taken and the period within which decisions on appeal must be rendered.

That the foregoing interpretation of Business and Professions Code section 11552 comports with the legislative intent is reinforced by the fact that in 1972 the Legislature added section 11552.2 to the Subdivision Map Act in order to afford any person affected by a subdivision in cities with a population in excess of 2,800,000 (City of Los Angeles) the right to appeal from an advisory agency decision on a tentative tract map.

(Stats. 1972, ch. 825, effective Aug. 11, 1972.) The section provides that in such cities "[n]otwithstanding the provisions of Section 11552 of this chapter, . . . any person affected by a proposed subdivision, *rather than only the subdivider,* may appeal the decision of the advisory agency . . . with respect to the tentative map of such proposed subdivision. . . ." (Italics added.)

■ Although construction of a statute is a judicial function, where a statute is unclear, a subsequent expression of the Legislature bearing upon the intent of the prior statute, though not binding upon a court, may properly be considered in determining the effect of the prior statute. (*Bd. of Soc. Welfare* v. *County of L. A.,* 27 Cal.2d 90, 97 [162 P.2d 635]; *Stockton Sav. & Loan Bank* v. *Massanet,* 18 Cal.2d 200, 204 [114 P.2d 592].) ■ The language of Business and Professions Code section 11552.2—"rather than only the subdivider"—indicates that by enacting section 11552 the Legislature intended to limit the right of appeal to subdividers only. Los Angeles had by city ordinance long provided for appeals from an advisory agency decision on a tentative tract map. (See *Great Western Sav. & Loan Assn.* v. *City of Los Angeles,* 31 Cal.App.3d 403, 410-411 [107 Cal.Rptr. 359].) Had the city validly been empowered to so extend the right of appeal by ordinance, enactment of Business and Professions Code section 11552.2 would have been unnecessary.

It is further noted that Assembly Bill 497, which was signed by the Governor on April 3, 1974, and which will become operative on January 1, 1975, amends Business and Professions Code section 11552 by adding subdivision (c) allowing local agencies to adopt an ordinance permitting "any interested person adversely affected by a decision of the advisory agency or appeal board" to file a complaint with the governing body "concerning any decision of the advisory agency or appeal board."[4] The

----

[4]Subdivision (c) reads: "(c) Where local ordinance so provides, any interested person adversely affected by a decision of the advisory agency or appeal board may file a complaint with the governing body concerning any decision of the advisory agency or appeal board. Any such complaint shall be filed with the clerk of the legislative body within 15 days after the action of the advisory agency or appeal board which is the subject of the complaint. Upon the filing of the complaint the governing body may set the matter for hearing. Such hearing shall be held within 30 days after the filing of the complaint. Such hearing may be a public hearing for which notice shall be given in the time and manner provided.

"Upon conclusion of the hearing the governing body shall, within seven days, declare its findings based upon the testimony and documents produced before it or before the advisory board or the appeal board. It may sustain, modify, reject or overrule any recommendations or rulings of the advisory board or the appeal board and may make such findings as are not inconsistent with the provisions of this chapter or local ordinance adopted pursuant to this chapter."

passage of Assembly Bill 497 is further evidence that the Legislature intended Business and Professions Code section 11552 to be the exclusive regulation on the subject of appeals from advisory agency decisions on tentative tract maps.

The county contends that its power to enact a supplemental ordinance granting any aggrieved person the right to appeal is derived from subdivision (a) of Business and Professions Code section 11526 which provides: "(a) The design, improvement and survey data of subdivisions and the form and content of tentative and final maps thereof, and the procedure to be followed in securing official approval are governed by the provisions of this chapter and by the additional provisions of local ordinances dealing with subdivisions, the enactment of which is required by this chapter." The ordinance referred to in that section is one which a local agency "is required" to enact; that is, an ordinance regulating the design and improvement of subdivisions. (Bus. & Prof. Code, §§ 11506, 11525.[5]) Section 11526, subdivision (a), impliedly authorizes local agencies to prescribe in an ordinance regulating the design and improvement of subdivisions the procedure to be followed by a subdivider for securing official approval of a tentative or final map. But the section does not logically, either by its terms or by implication, authorize enactment of a supplemental local ordinance granting "any aggrieved person" the right to appeal from an advisory agency decision on a tentative map.

There is much to be said from a policy standpoint of extending the right to appeal advisory agency decisions on a tentative tract map to any interested person rather than confining it to the subdivider. Community members have a legitimate interest in the subdivision process because the character of a neighborhood is largely influenced by the way in which land is subdivided, and once land is subdivided and lots are sold, the opportunity to remedy errors or mistakes in judgment made by the advisory agency in approving the subdivision is virtually nil. (See Taylor, *Current Problems in California Subdivision Control*, 13 Hastings L.J. 344, 345.) The trend is to permit greater public participation in such governmental

---

[5]Business and Professions Code section 11525 provides: "Control of the design and improvement of subdivisions is vested in the governing bodies of cities and of counties. Every county and city shall adopt an ordinance regulating and controlling the design and improvement of subdivisions. Such ordinance shall specifically provide for proper grading and erosion control, including the prevention of sedimentation or damage to offsite property.".

Business and Professions Code section 11506 provides: " 'Local ordinance' refers to an ordinance regulating the design and improvement of subdivisions, enacted by the governing body of any city or county under the provisions of this chapter or any prior statute, regulating the design and improvement of subdivisions, in so far as the provisions of the ordinance are consistent with and not in conflict with the provisions of this chapter."

decisions. (See *Scott* v. *City of Indian Wells,* 6 Cal.3d 541 [99 Cal.Rptr. 745, 492 P.2d 1137].) That the approval of a tentative tract map is a critical stage in land development and a point at which the public's interest in the environmental impact of the development should be considered has been recognized by the Legislature. (Pub. Resources Code, § 21080.) However, the implementation of a policy of wider public participation in the subdivision process by permitting any interested person to appeal advisory agency decisions on tentative tract maps is for the Legislature. As we interpret the Subdivision Map Act as it is now written, a local ordinance extending the right of appeal to any interested person would be inconsistent with Business and Professions Code section 11552.

We conclude that to construe the San Bernardino County Code provisions relating generally to appeals from decisions and rulings of the county planning commission to give "any aggrieved person" the right to appeal from a decision of the planning commission on a tentative tract map would render it an invalid regulation on a matter now preempted by the Subdivision Map Act. Such construction must be avoided. Accordingly, the ruling below cannot be upheld on the doctrine of exhaustion of administrative remedies.

(b) *Validation of the Project*

■ The alternative ground on which the court below denied plaintiffs' petition is that the Wilson project was validated and confirmed by the 1972 urgency amendment to the CEQA, effective December 5, 1972. Among other provisions, the amendment added sections 21169 and 21170 quoted in full in the margin below.[6]

---

[6]Section 21169 provides: "Any project defined in subdivision (c) of Section 21065 undertaken, carried out or approved on or before the effective date of this section and the issuance by any public agency of any lease, permit, license, certificate or other entitlement for use executed or issued on or before the effective date of this section notwithstanding a failure to comply with this division, if otherwise legal and valid, is hereby confirmed, validated and declared legally effective. Any project undertaken by a person which was supported in whole or in part through contracts with one or more public agencies on or before the effective date of this section, notwithstanding a failure to comply with this division, if otherwise legal and valid, is hereby confirmed, validated and declared legally effective."

Section 21170 provides in pertinent part: "(a) Section 21169 shall not operate to confirm, validate or give legal effect to any project the legality of which was being contested in a judicial proceeding in which proceeding the pleadings, prior to the effective date of this section, alleged facts constituting a cause of action for, or raised the issue of, a violation of this division and which was pending and undetermined on the effective date of this section; *provided,* however, that Section 21169 shall operate to confirm, validate or give legal effect to any project to which this subdivision applies if, prior to the commencement of judicial proceedings and in

The validating sections were added in the wake of *Friends of Mammoth* v. *Board of Supervisors,* 8 Cal.3d 247 [104 Cal.Rptr. 761, 502 P.2d 1049]. The court's refusal to delay the effective date of its ruling so as to make it prospective only gave rise to grave uncertainties concerning private projects which were under construction or in which developers had expended or committed substantial sums prior to the decision. Sections 21169 and 21170 were enacted to validate private projects which had been approved or were in the process of construction prior to the effective date of the statute.

In the case at bench plaintiffs' mandate petition was pending prior to the effective date of the validating act. Consequently, in determining whether or not the project was validated, the controlling provision is the qualifying proviso of section 21170 that, notwithstanding the pendency of a judicial proceeding, the project is validated "if, prior to the commencement of judicial proceedings and in good faith and in reliance upon the issuance by a public agency of any lease, permit, license, certificate or other entitlement for use, substantial construction has been performed and substantial liabilities for construction and necessary materials have been incurred." Plaintiffs urge that "substantial construction" within the meaning of the statute could not have been performed prior to the institution of this proceeding because a building permit was not issued until about November 27, 1972. The assumption that construction must be in reliance upon the issuance of a building permit is devoid of merit.

Section 21170 refers to good faith commencement of construction "in reliance upon the issuance by a public agency of any lease, permit, license, certificate, *or other entitlement for use.* . . ." (Italics supplied.) Approval of a tentative tract map and a site development plan clearly constitutes "other entitlement for use" within the meaning of the statute. (See § 21080.[7]) Moreover, the record reveals that Wilson expended substantial sums in reliance upon the grading permit and the permit to construct the

---

good faith and in reliance upon the issuance by a public agency of any lease, permit, license, certificate or other entitlement for use, substantial construction has been performed and substantial liabilities for construction and necessary materials have been incurred. . . ." (Italics supplied.)

[7]Public Resources Code section 21080 provides: "(a) Except as otherwise provided in this division, this division shall apply to discretionary projects proposed to be carried out or approved by public agencies, including, but not limited to, the enactment and amendment of zoning ordinances, the issuance of zoning variances, the issuance of conditional use permits and the approval of tentative subdivision maps (except where such a project is exempt from the preparation of an environmental impact report pursuant to Section 21166).

"(b) This division shall not apply to ministerial projects proposed to be carried out or approved by public agencies."

retaining wall and, in addition, incurred contractual liabilities for construction and material in excess of $900,000 prior to the filing of the present lawsuit.

The record contains substantial support for the trial court's determination that the Wilson project was validated and confirmed by sections 21169 and 21170.

### (c) *Conformity of the Tentative Tract Map With the General Plan and Zoning for the Area*

Plaintiffs' final contention is that the approval of the tentative tract map was in violation of Business and Professions Code section 11549.5, subdivisions (a) and (b), and section 11526, subdivision (c).

Section 11549.5 provides in pertinent part: "A governing body of a city or county shall deny approval of a final or tentative subdivision map if it makes any of the following findings: [¶] (a) That the proposed map is not consistent with applicable general and specific plans. [¶] (b) That the design or improvement of the proposed subdivision is not consistent with applicable general and specific plans."

Section 11526, subdivision (c) provides: "(c) No city or county shall approve a tentative or final subdivision map unless the governing body shall find that the proposed subdivision, together with the provisions for its design and improvement, is consistent with applicable general or specific plans of the city or county."

The planning commission expressly found that the proposed subdivision was consistent with applicable general and specific plans of the county.[8] The uncontradicted evidence was that the property in question was zoned R-3 after the general plan encompassing the property was adopted and that the prior use for a 38-cottage motel on the property was consistent with the zoning and the general plan. At the planning commission hearing the subject of conformity with the general plan was fully considered. Substantial evidence exists to support the commission finding that the proposed subdivision is not inconsistent with applicable general and specific plans for the area.

The order denying the petition for administrative mandamus insofar as it related to the Wilson project should be affirmed.

---

[8]Plaintiffs do not attack the finding on the ground it should have been made by the "governing body" (Bus. & Prof. Code, § 11526, subd. (c)), rather than the planning commission. Any objection in that regard will, therefore, be deemed to have been waived.

## KAISER-AETNA PROJECT

With respect to the Kaiser-Aetna project, plaintiffs' amended petition charged in substance as follows: Kaiser-Aetna is the owner of a parcel of land in the unincorporated Lake Arrowhead area of the County of San Bernardino; on or about July 31, 1972, the county granted Kaiser-Aetna permission to build a 181-unit multiple residential development on the property; defendants failed to comply with the CEQA in that no environmental impact report (EIR) was made or considered prior to the approval of the project, or if such a report was made, it was inadequate and construction had not commenced as of December 1, 1972.

Kaiser-Aetna answered with general denials and affirmative defenses and filed a declaration and memorandum of authorities in opposition to the order to show cause re preliminary injunction. The cause was submitted on the pleadings, declarations, and record of the administrative proceeding sought to be reviewed. The following pertinent facts are not in dispute:[9]

Kaiser-Aetna was the purchaser of a 23-acre parcel of land in the Lake Arrowhead area of the county; on June 1, 1972, the county planning commission, following a public hearing, approved a site development plan for the construction of a 181-unit residential development on the property; on a citizen's appeal of the planning commission decision, the board of supervisors held a public hearing and on July 31, 1972, upheld the planning commission decision; on August 15, 1972, Kaiser-Aetna filed a tentative tract map with the planning commission for approval; following the Supreme Court decision in *Friends of Mammoth* v. *Board of Supervisors* (1972) *supra,* 8 Cal.3d 247, the county required Kaiser-Aetna to submit a preliminary EIR to a county environmental review committee to enable it to determine whether an EIR should be required; on October 19, 1972, Kaiser-Aetna submitted its preliminary report; following a review of the report, the county evaluation committee ordered Kaiser-Aetna to prepare and submit a draft EIR; on December 4, 1972, Kaiser-Aetna submitted its draft EIR (dated Nov. 14, 1972) to the county evaluation committee; the committee reviewed the report and thereafter prepared and submitted its own EIR to the county planning commission; the planning commission held public hearings and on December 14, 1972, approved the EIR and Kaiser-Aetna's tentative tract map.[10]

---

[9]As in the Wilson matter, plaintiffs do not raise any issue concerning the propriety of trying a mandate proceeding on declarations. (See fn. 2, *ante.*)

[10]Kaiser-Aetna's declaration in opposition to the order to show cause stated that in reliance upon county approval of the site development plan, it expended approximately $40,000 in architectural and engineering fees in the preparation of the tentative tract map and of working drawings for the construction of the project.

Following argument and submission, the court entered a minute order setting forth its intended decision in which it stated that plaintiffs' petition would be denied as to the Kaiser-Aetna project on the ground the procedure followed by defendants and real party in interest in the preparation and approval of the EIR was validated by the provisions of section 21172.5. Plaintiffs thereupon requested findings of fact and conclusions of law. The court did not make findings, but instead signed and entered a judgment denying the petition and reciting that findings and conclusions were not required.

Plaintiffs appeal from the judgment. They advance two contentions: (1) The court erred in concluding that the procedure followed by defendants in the preparation and approval of the EIR was validated by section 21172.5 and (2) the judgment must be reversed for failure to make findings of fact and conclusions of law.

(a) *Validation of the Environmental Impact Report*

■ As part of the 1972 urgency amendment to the CEQA, the Legislature, in addition to the enactment of sections 21169 and 21170 validating private projects undertaken and approved prior to the effective date of the urgency measure, enacted sections 21171 and 21172.5, quoted in the margin below.[11] These sections provide a 120-day moratorium period within which the state office of planning and research and local agencies were to prepare guidelines for the evaluation of projects and for the prep-

---

[11]Section 21171 provides: "This division, except for Section 21169, shall not apply to the issuance of any lease, permit, license, certificate or other entitlement for use for any project defined in subdivision (c) of Section 21065 or to any project undertaken by a person which is supported in whole or in part through contracts with one or more public agencies until the 121st day after the effective date of this section. This section shall not apply to any project to which Section 21170 is applicable or to any successor project which is the same as, or substantially identical to, such a project.

"This section shall not prohibit or prevent a public agency, prior to the 121st day after the effective date of this section, from considering environmental factors in connection with the approval or disapproval of a project and from imposing reasonable fees in connection therewith."

Section 21172.5 provides: "Until the 121st day after the effective date of this section, any objectives, criteria and procedures adopted by public agencies in compliance with this division shall govern the evaluation of projects defined in subdivisions (a) and (b) of Section 21065 and the preparation of environmental impact reports on such projects when required by this division.

"Any environmental impact report which has been completed or on which substantial work has been performed on or before the 121st day after the effective date of this section, if otherwise legally sufficient, shall, when completed, be deemed to be in compliance with this division and no further environmental impact report shall be required except as provided in Section 21166."

aration of EIRs. (§§ 21082, 21083.[12]) The court below determined that section 21172.5 validated the EIR prepared and considered in connection with the Kaiser-Aetna project.

Plaintiffs contend that section 21172.5 only applies to public projects (those defined in subds. (a) and (b) of § 21065) and not to private projects.[13] Defendants counter that only the first paragraph relates to public projects and that the second applies to private as well as to public projects.

A review of the background of the enactment of the 1972 urgency amendment to the CEQA leads us to the conclusion that defendants' construction of section 21172.5 comports with the intention of the Legislature.

Prior to *Friends of Mammoth,* the CEQA was generally believed to apply only to projects undertaken or funded by public agencies. (Seneker, *The Legislative Response to Friends of Mammoth,* 48 State Bar J. 127, 128.) Partly because of the failure of the state office of planning and research to formulate and communicate necessary guidelines to public agencies, the act was largely ignored even as to public projects. (Seneker, *supra,* pp. 128-129.) Sections 21171 and 21172.5 were enacted in order to allow time for the preparation and adoption of guidelines for the implementation of the CEQA as amended by the urgency measure of December 5, 1972.

Section 21171 relates to private projects. It provides that except for section 21169, the act shall not apply to the issuance of any lease, permit, license, certificate or other entitlement for use for any private project until the 121st day after the effective date of the section (i.e., until Apr. 5, 1973), provided, that the moratorium shall not apply to any project subject to section 21170 (a project the legality of which is being contested on the effective date of the section). It further provides, however, that during the moratorium period the section "shall not prohibit" a public agency from considering environmental factors in connection with the

---

[12]State Guidelines were adopted on February 7, 1973. (Cal. Admin. Code, tit. 14, div. 6, ch. 3.)

[13]Section 21065 of the Public Resources Code defining the term "project" reads: " 'Project' means the following:

"(a) Activities directly undertaken by any public agency.

"(b) Activities undertaken by a person which are supported in whole or in part through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies.

"(c) Activities involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies."

approval or disapproval of a project and from requiring reasonable fees in connection therewith.

In recognition of the fact that from its inception the CEQA clearly applied to public projects, they were not exempt from the act during the moratorium period. However, the first paragraph of section 21172.5 provides that during the 120-day period, any objectives, criteria and procedure adopted by public agencies in compliance with the act shall govern the evaluation of public projects and the preparation of EIRs on such projects. The second paragraph of that section, the provision at issue in the case at bench, provides: "Any environmental impact report which has been completed or on which substantial work has been performed on or before the 121st day after the effective date of this section, if otherwise legally sufficient shall, when completed, be deemed to be in compliance with this division and no further environmental impact report shall be required except as provided in Section 21166."

In his excellent article in the State Bar Journal, Mr. Seneker makes the following observations concerning sections 21171 and 21172.5: "It is important to note that there is a significant difference in language between Sections 21171 and 21172.5. The former (applying to private projects) *does not specifically validate environmental impact reports prepared during the moratorium period.* Rather, the determinative point is whether the project has been approved by the public agency prior to the end of the moratorium period. If so, then an EIR prepared in accordance with the Act's requirements will not be needed. Moreover, if part of the project has been approved prior to April 5, 1973, but another or an additional discretionary governmental approval is required after April 5, 1973, an EIR must be prepared under the Act only if the subsequent approval will involve a 'greater degree of responsibility and control over the project as a whole.' See 14 Cal.Adm. Code § 15070(e). The failure of Section 21171, however, specifically to validate environmental impact reports prepared under local ordinances during the moratorium period does raise the possibility that a developer might comply in good faith with ordinances adopted by local governmental agencies following the *Friends of Mammoth* decision in preparing an environmental impact report during the moratorium period only to discover that, if his project has not actually been approved prior to the expiration of the moratorium period, he may be required to resubmit a new or amended environmental impact report complying with the Act, as implemented by the Guidelines, prior to securing approval of his project after the moratorium period has expired." (Italics supplied; Seneker, *supra,* 48 State Bar J. 127, 132, 164, fn. 12.)

As Mr. Seneker correctly points out, section 21171 relating to private

projects does not *specifically* validate EIRs prepared pursuant to local ordinances during the moratorium period. However, it would seem illogical to assume the Legislature intended to empower public agencies to require the preparation and consideration of an EIR on private projects during the moratorium period yet give no validity to reports so prepared in pursuance of such requirement.

Under section 21171, if a project is *approved* during the moratorium period, an EIR is not required, provided the validity of the project was not being contested by a judicial proceeding commenced before the effective date of the section. In the case at bench, Kaiser's site development plan was approved by the board of supervisors on July 31, 1972, and the tentative tract map was approved on December 14, 1972. Had it not been for the filing of the lawsuit, the approval of the tentative tract map would have been validated by section 21171.[14] The question, therefore, is whether the project was validated by the preparation and consideration of an EIR as required by the county, notwithstanding the pendency of the lawsuit.

With respect to public projects, it is clear that the second paragraph of section 21172.5 would validate an EIR completed or on which substantial work had been performed before the expiration of the moratorium period if the report is otherwise legally sufficient when completed. That validating provision does not exclude from its protection projects whose validity was being contested on the effective date of the section. While section 21172.5 is not artfully drawn, we believe the second paragraph may be reasonably construed as being applicable to private as well as public projects. By its terms, it relates to "[a]ny environmental impact report." Any other construction would place EIRs prepared on private projects during the moratorium period pursuant to local ordinances or regulations on a different footing than those prepared on public projects. We perceive no rational basis for treating the two differently and do not believe the Legislature so intended. In the light of the final paragraph of section 21171 empowering public agencies to consider environmental factors with respect to private projects during the moratorium period, a reasonable interpretation of the second paragraph of section 21172.5 is that it was intended to apply to EIRs prepared on a private project in

---

[14]It is possible that approval of the site development plan constituted the significant point of approval of the project. If so, an attack upon such approval might have been barred by laches. However, although Kaiser-Aetna's answer raised the defense of laches, the court below did not make a finding on that issue. It based its decision solely on the determination that the EIR was validated by section 21172.5.

compliance with local requirements as well as to those prepared for public projects.

The record of the administrative proceeding in the case at bench reveals that immediately after the decision in *Friends of Mammoth,* the San Bernardino County Board of Supervisors sought to comply with the CEQA as interpreted by that decision by establishing a procedure for the preparation and evalution of EIRs in connection with approval of private projects. That procedure was followed in connection with the Kaiser-Aetna project. A draft EIR was prepared and submitted to the county evaluation committee; the committee independently evaluated and analyzed the report and prepared and submitted its own EIR to the county planning commission; following public hearings, the county planning commission considered the EIR before approving the tentative tract map. In the foregoing circumstances, the court below correctly determined that the procedure followed in the preparation and consideration of the EIR and the EIR itself were validated by section 21172.5.

Plaintiffs attack the adequacy of the EIR on the Kaiser-Aetna project in several respects. They contend the report failed to deal adequately with the problem of water supply, the impact of added traffic which would be generated by the development, and the "project's costs/benefit impact on the area." However, plaintiffs have failed to substantiate their assertions of inadequacy by record reference to the EIR or to any evidence adduced at the administrative proceedings. A review of the record shows that the draft EIR, together with the county evaluation committee's analysis and report, did consider and discuss all pertinent environmental factors, including zoning, air, water, terrain and sewers. We cannot say that the report was inadequate as a matter of law.

(b) *Failure to Make Findings*

■ Plaintiffs' final contention is that the judgment must be reversed because the court below, despite plaintiffs' request, failed to make findings of fact and conclusions of law. The contention is without merit.

Insofar as the Kaiser-Aetna project is concerned, plaintiffs' amended mandate petition was one seeking to review and annul county approval of the tentative tract map on the sole ground of alleged noncompliance with the CEQA. The scope of review in such proceedings is prescribed by sections 21168 and 21168.5. Those sections were added by the 1972 urgency amendment to the CEQA (effective Dec. 5, 1972) and were in force when the county approved the tentative tract map (Dec. 14, 1972) and when the amended mandate petition was filed (Dec. 15, 1972).

Section 21168[15] prescribes the scope of review in an action to review and annul a decision of a public agency on the ground of noncompliance with the CEQA where the decision sought to be reviewed was made as a result of a proceeding in which the law requires a public hearing and the taking of evidence. The section provides that in such actions, the court "shall not exercise its independent judgment on the evidence but shall only determine whether the act or decision is supported by substantial evidence in the light of the whole record."

Section 21168.5[16] prescribes the scope of review in actions or proceedings to review and set aside a decision of a public agency other than an action brought under section 21168. It provides that review extends only "to whether there was a prejudicial abuse of discretion" and that "abuse of discretion" is established if an agency has not proceeded in the manner required by law or if the decision is "not supported by substantial evidence."

In the case at bench, although the record shows that a public hearing on the tentative map was held, we cannot determine from the record whether the county ordinance *required* a public hearing and the taking of evidence in acting on a tentative tract map. Except as to the City of Los Angeles (Bus. & Prof. Code, § 11552.2), the Subdivision Map Act contains no provision requiring such a public hearing. (See Comment, *Land Development And The Environment,* 5 Pacific L.J. 55, 87-88.) Nor does the CEQA require a public hearing in the environmental review procedure. (*Concerned Citizens of Palm Desert* v. *Board of Supervisors (Consolidated Land Investment Company), ante,* p. 272 [113 Cal.Rptr. 338].)

In any event, whether the scope of review be that prescribed by sections

---

[15]Section 21168 reads: "Any action or proceeding to attack, review, set aside, void or annul a determination or decision of a public agency, made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency, on the grounds of noncompliance with the provisions of this division shall be in accordance with the provisions of Section 1094.5 of the Code of Civil Procedure.

"In any such action, the court shall not exercise its independent judgment on the evidence but shall only determine whether the act or decision is supported by substantial evidence in the light of the whole record."

[16]Section 21168.5 provides: "In any action or proceeding, other than an action or proceeding under Section 21168, to attack, review, set aside, void or annul a determination or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence."

21168 or 21168.5, the failure to make findings did not invalidate the judgment. Where the only issue in a proceeding is whether the administrative decision is supported by substantial evidence in the light of the whole record or whether there has been an abuse of discretion, findings are not essential to effective appellate review of the decision of the trial court. In such cases, the issue being essentially one of law, findings are not required. (*Savelli* v. *Board of Medical Examiners,* 229 Cal.App.2d 124, 134-135 [40 Cal.Rptr. 171]; Cal. Administrative Mandamus (Cont.Ed. Bar 1966) § 14.3, p. 235.) Although a contrary view is expressed in *Beloin* v. *Blankenhorn,* 97 Cal.App.2d 662, 664 [218 P.2d 552], we believe the sounder rule is that expressed in *Savelli.*[17] In the case at bench, plaintiffs do not question the applicability of the substantial evidence test rather than the independent judgment rule.[18] In view of the limited scope of review and the absence of factual issues, the failure to make findings did not affect the validity of the judgment. (*International Assn. of Fire Fighters* v. *City of Palo Alto,* 60 Cal.2d 295, 300-301 [32 Cal.Rptr. 842, 384 P.2d 170].)

## DISPOSITION

The judgment and order in both the Marvin Wilson matter and the Kaiser-Aetna matter are affirmed.

Kerrigan, Acting P. J., and Kaufman, J., concurred.

A petition for a rehearing was denied April 30, 1974, and appellants' petition for a hearing by the Supreme Court was denied June 5, 1974. Tobriner, J., and Mosk, J., were of the opinion that the petition should be granted.

---

[17]Although findings are not *required* in a proceeding in administrative mandamus to review a decision of an administrative body where the only issue is whether the decision is supported by substantial evidence, where the applicable scope of review is the independent judgment test findings must be made if requested. (Cal. Administrative Mandamus, *supra,* § 14.2, pp. 234-235.) However, irrespective of the applicable scope of review, it would be advisable for trial courts to make findings in all cases. Even though the scope of review may be the substantial evidence test, the mandate proceeding may raise additional issues requiring findings. (Cal. Administrative Mandamus (1974 Supp.) § 14.3, p. 86.) Moreover, in the light of the recent decision of *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28 [112 Cal.Rptr. 805, 520 P.2d 29], findings will enable the reviewing court to determine what test the trial court employed in reviewing the administrative decision and the ground upon which it found that test to be applicable.

[18]On the record before us it does not appear that the decision of the planning commission approving the tentative tract map affected "fundamental vested rights" of any of the plaintiffs. (See *Bixby* v. *Pierno,* 4 Cal.3d 130, 143 [93 Cal.Rptr. 234, 481 P.2d 242]; *Strumsky* v. *San Diego County Employees Retirement Assn., supra,* 11 Cal.3d 28.) We, therefore, need not consider the intriguing question whether, if it had, the Legislature could nevertheless validly prescribe the substantial evidence scope of review as it has done in sections 21168 and 21168.5.