[No. H000282. Sixth Dist. July 10, 1986.]

CITY OF CARMEL-BY-THE-SEA, Plaintiff and Respondent, v.
BOARD OF SUPERVISORS OF MONTEREY COUNTY et al.,
Defendants and Respondents;
MISSION RANCH CORPORATION,
Real Party in Interest and Appellant.

[No. H001125. Sixth Dist. July 10, 1986.]

CITY OF CARMEL-BY-THE-SEA, Plaintiff and Appellant, v.
BOARD OF SUPERVISORS OF MONTEREY COUNTY et al.,
Defendants and Respondents.

230

232

**COUNSEL**

Brian Finegan and Michael D. Cling for Real Party in Interest and Appellant.

Donald G. Freeman, City Attorney, and Michael W. Stamp for Plaintiff and Respondent and Plaintiff and Appellant.

Ralph R. Kuchler, County Counsel, and Jose Rafael Ramos, Senior Deputy County Counsel, for Defendants and Respondents.

**OPINION**

**BRAUER, J.**—On June 19, 1984, the County of Monterey (County) Board of Supervisors adopted an ordinance rezoning property owned by Mission Ranch Corporation (Mission Ranch). The City of Carmel (City) petitioned

the superior court for a writ of mandamus to compel County to set aside its rezoning decision, and on December 12, 1984, the court entered its judgment ordering that the peremptory writ issue. Real party in interest Mission Ranch filed this appeal, claiming that the trial court committed several procedural errors warranting reversal, and that County's rezoning decision was lawful under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq., hereafter referred to as CEQA). County has not appealed. City filed a separate appeal from a postjudgment order denying attorney's fees. We have consolidated these two appeals for purposes of this opinion. For reasons discussed below we affirm both the trial court's judgment and its postjudgment order.

## BACKGROUND

The Mission Ranch property consists of 20.69 acres near the mouth of the Carmel River. It extends from high ground abutting the City of Carmel southward to the river. A state beach forms a sand bar which closes the mouth of the river. Behind this sand bar the rising and ebbing ocean tides and the inflow of river water combine to create a marshy area known as the wetlands. The present use of the property is as a resort hotel. Improvements include thirteen cottages, a seven-room motel, a six-room inn, a restaurant, tennis courts and a converted barn used occasionally for musical events. For some time the entire property has been zoned R-1, a zoning which is inconsistent with the existing use.

In April of 1983 the Carmel area land use plan (LUP or the plan) went into effect. The plan specifically identifies the Mission Ranch property for special treatment. It provides a means for Mission Ranch to apply for a use permit to continue the existing use and also allows for future residential development if and when the existing use is abandoned. Any development, however, "shall be subject to the preservation of the wetlands." The plan limits future development to "clustered medium-density (2-6 units per net developable acre not including wetland area, but not to exceed a maximum of 75 units) . . . provided that such development conforms to the policies of the plan, particularly the resource protection policies for the protection of coastal wetlands."

The plan also sets forth some general policies emphasizing the importance of preserving environmentally sensitive areas such as the wetlands. Wetlands are defined as "lands which may be covered periodically or permanently with shallow water and include saltwater marshes, fresh water marshes, open or closed brackish water marshes, swamps, mudflats and fens."

The uses indicated in the LUP for the Mission Ranch property imply two separate zoning designations: one for the wetlands area, which would insulate it from any future development, and one for the balance of the property.

On September 19, 1983, Mission Ranch applied to County for a rezoning of the property from R-1 to "O" (open space) and "R-3-S." The R-3 designation would allow the owners to apply for a use permit either for continued use as a resort or for the clustered residential use. The "S" designation would fix the allowable density of future development somewhere between two and six units per acre as provided in the plan.

Mission Ranch stated in its application that its purpose in applying for rezoning was "to allow a use permit application for the existing resort hotel operation." The application further stated: "No new development is proposed as part of this rezoning or use permit application."

In order to accomplish the rezoning it would be necessary to identify that portion of the property which was to be considered wetlands and receive the "O" classification. Accordingly, Mission Ranch submitted with its rezoning application the results of a field study conducted by Dr. Linda Fox which included a map indicating a boundary line for the wetlands. Dr. Fox calculated the wetlands to be 4.68 acres.

Upon receipt of the application the County planning department conducted an initial study of possible environmental impact and recommended, "based on the applicant's intent to keep the existing resort hotel use," that a negative declaration, rather than an environmental impact report (an EIR), be prepared.[1] This recommendation was adopted by the planning commission at an environmental hearing on October 12, 1983.

There followed a series of public hearings on the matter. Controversy crystallized around a single issue: where should the wetlands boundary line be drawn? This line would determine not only the extent of zoning protection of the wetlands area but also the size of the remaining developable portion of the property and thus the eventual density of any future development. Opponents of the rezoning produced experts who argued that the wetlands area should include the riparian corridor and certain other wetlands transition areas. Proponents argued that these areas are well protected in the LUP by means of building setbacks. These setbacks disallow any development within a certain distance from an environmentally sensitive area (200 feet from a

[1] The requirements of CEQA will be discussed more fully below.

riverbank and 100 feet from wetlands). The key point is that the setback areas would still be part of the R-3-S parcel and would be included in computing allowable units per acre. On the other hand if the riparian corridor and wetlands transition areas were included in the wetlands open space zone, the net developable acreage in the R-3-S parcel, and consequently the potential density, would be reduced.

The planning commission heard testimony from an array of experts, representatives of environmental groups, concerned citizens and officials of the City of Carmel. The matter was continued several times in order to allow for further information gathering. Eventually the commissioners adopted Dr. Fox's wetlands boundary delineating 4.68 acres, to which was added the flowing river channel consisting of 1.46 acres. This 6.14 acres was to be zoned O-D (the "D" standing for "design control"). The commissioners then determined, upon staff recommendation, that the remaining 14.55 acres be zoned to accommodate 4.5 units per acre to a maximum of 65 units. This scheme was adopted by the County board of supervisors on June 19, 1984.

## ISSUES

City's main challenge to the rezoning decision is that an EIR should have been prepared rather than a negative declaration. City argued that the rezoning was a "project," as defined in CEQA, which had the potential to produce significant adverse environmental impact; therefore an EIR was absolutely required. County and Mission Ranch took the position at trial that no EIR was required at the rezoning phase since no expanded use of the property was proposed. The rezoning was simply a means to bring the property into conformance with the LUP. By itself it would not produce the significant environmental impact sufficient to trigger preparation of an EIR.

It is further urged that an EIR which was prepared after the rezoning decision, in connection with an application by Mission Ranch to develop the property, suffices to quell any environmental concerns aroused by the rezoning. In other words, Mission Ranch contends that the local agency has the discretion to determine at which stage of a project an EIR should be prepared. Additionally, Mission Ranch claims that the LUP amounts to a certified equivalent of an EIR for purposes of the rezoning.

Finally, there is disagreement as to whether or not County followed the definition of wetlands as set forth in the LUP, when making its decision regarding the ultimate size of the wetlands area. We consider the matter of the wetlands definition to be part of the principal issue and take it up in that discussion.

City separately appeals from the postjudgment order denying attorney's fees, claiming that its successful prosecution of litigation in the lower court entitles it to attorney's fees under the private attorney general doctrine. The dispositive issue is whether City is precluded from collecting attorney's fees under Code of Civil Procedure section 1021.5 since it is a public entity.

In summary then, the issues, as we see them, are: (1) Was the rezoning a project and, if so, was an EIR required; (2) Does an EIR prepared in connection with a subsequent phase of the project suffice to comply with CEQA; (3) Is the LUP a certified equivalent of an EIR; and (4) Is City, as a public entity, entitled to attorney's fees under the private attorney general doctrine.

Before we delve into these issues we must dispense with several procedural matters, namely: (1) Was the administrative record properly admitted into evidence; (2) Was a statement of decision necessary; and (3) What is the applicable standard of review.

PROCEDURAL MATTERS

*Sufficiency of the Record*

This first claim need not detain us long. Apparently the entire administrative record was not admitted into evidence at the trial level and was therefore not included in the clerk's transcript on appeal. Mission Ranch argues that this constitutes reversible error. ▪ On the contrary, the error is technical and harmless. While the trial court did not enter an order admitting the entire record into evidence, it is clear from the transcripts of the hearing that the trial judge in fact had the entire record before him and considered it. All parties were familiar with it as well. The record is now before this court by virtue of an augmentation order dated June 5, 1985.[2]

*Statement of Decision*

Mission Ranch's claim that the trial court's decision should be reversed for lack of a statement of decision is two-fold: (1) the court is required under Code of Civil Procedure section 632 to set forth the factual and legal basis for its decision on all principal controverted issues; and (2) the request for a statement of decision, made within 10 days after the court's peremptory

---

[2]We ordered the record to be further augmented on June 24, 1986, by inclusion of the entire LUP upon stipulation by counsel that this document was properly before the administrative agency and the trial court.

writ of mandate was mailed to all parties, was timely since the trial took place over two days. (Code Civ. Proc., § 632.) We find merit in neither of these claims.

In a mandamus action testing the validity of an administrative decision, the trial court is confined to a review of the administrative record to determine whether the record supports the decision. It may not substitute its judgment for that of the administrative agency, unless a fundamental vested right is at stake. (*Toso* v. *City of Santa Barbara* (1980) 101 Cal.App.3d 934, 943 [162 Cal.Rptr. 210]; *Roccaforte* v. *City of San Diego* (1979) 89 Cal.App.3d 877, 885 [152 Cal.Rptr. 558].) It is generally agreed that a landowner has no fundamental vested right in the continuation of any particular zoning designation (*Toso* v. *City of Santa Barbara, supra,* 101 Cal.App.3d 934), and indeed the contrary is not argued here. ■ Therefore, the trial court is limited to a review of the substantiality of the evidence received by the administrative body and may not reweigh evidence. This is not a factfinding process, as contemplated by Code of Civil Procedure section 632, and findings are not essential to effective appellate review. (*Friends of Lake Arrowhead* v. *Board of Supervisors* (1974) 38 Cal.App.3d 497 [113 Cal.Rptr. 539]; *Brentwood Assn. for No Drilling, Inc.* v. *City of Los Angeles* (1982) 134 Cal.App.3d 491 [184 Cal.Rptr. 664].)

Mission Ranch's argument that the action, or part of it, should have been brought under traditional mandamus (Code Civ. Proc., § 1088 et seq.) rather than administrative mandamus (Code Civ. Proc., § 1094.5), even if correct, would not change this result. In neither case may the lower court substitute its independent judgment for that of the local agency where no constitutional issues are present. (*Toso* v. *City of Santa Barbara, supra,* 101 Cal.App.3d 934; *Mountain Defense League* v. *Board of Supervisors* (1977) 65 Cal.App.3d 723, 729 [135 Cal.Rptr. 588].)

We are aware that recent cases have indicated that findings may be advisable, regardless of the applicable scope of review, particularly when the peremptory writ is granted. (*Friends of Lake Arrowhead* v. *Board of Supervisors, supra,* 38 Cal.App.3d 497, 518.) Not only does this enable the administrative agency to avoid similar errors in the future, but also informs the reviewing court of the standard of review applied by the trial court. In the case at bar, however, the court did just this when it issued a 10-page peremptory writ of mandate setting forth the basis of its decision.

Although Mission Ranch's second point, that its request for a statement of decision was timely, is moot in light of the above discussion, we agree with the trial court's determination that the request was untimely since the

trial lasted less than one day and the request was not made prior to submission of the matter. (Code Civ. Proc., § 632.) Mission Ranch attempts to characterize an earlier hearing on another day as part of the trial. The record, however, reveals that this hearing was limited to a discussion of the pros and cons of a continuance and which segments of the administrative record were most important for the court's attention.

There is recent authority for the proposition that in an administrative mandamus action, the trial judge's reading of the administrative record signals the commencement of the proceedings, since that is the moment when the presentation of evidence begins. (*Bevli* v. *Brisco* (1985) 165 Cal.App.3d 812 [212 Cal.Rptr. 36].) In *Bevli,* however, the court stated on the record the exact number of hours spent reading the record prior to the opening of courtroom proceedings. In our case, although the judge indicated that he had spent some time reading the record, he did not specify how long, nor can we infer any particular amount of time from his comments.

*The Standard of Review*

It is not disputed that City's challenge to County's rezoning action based on failure to comply with CEQA was properly brought under Code of Civil Procedure section 1094.5, administrative mandamus, and is reviewable under the substantial evidence test. Public Resources Code section 21168 provides: "Any action or proceeding to . . . set aside . . . a determination . . . of a public agency, made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency,[3] on the grounds of noncompliance with the provisions of this division shall be in accordance with the provisions of Section 1094.5 of the Code of Civil Procedure. [¶] In any such action, the court shall not exercise its independent judgment on the evidence but shall only determine whether the act or decision is supported by substantial evidence in light of the whole record."

On the other hand, rezoning of property, even a single parcel, is generally considered to be a quasi-legislative act (*Toso* v. *City of Santa Barbara, supra,* 101 Cal.App.3d 934; *Arnel Development Co.* v. *City of Costa Mesa* (1980) 28 Cal.3d 511, 523 [169 Cal.Rptr. 904, 620 P.2d 565]), subject to review under ordinary mandamus. The standard for review of a quasi-legislative act is whether the action was arbitrary or capricious or totally

---

[3]CEQA Guidelines sections 15073 and 15074, Government Code sections 65854, 65856 and the Monterey County Code section 20.102.030, subdivisions (a) and (b) all provide for a public hearing in this case.

lacking in evidentiary support, or whether the agency has failed to follow the procedure and give the notices required by law. (*Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34 [112 Cal.Rptr. 805, 520 P.2d 29].)

Mission Ranch asks us to review separately the board's determination of the wetlands demarcation line under the less stringent "arbitrary or capricious" standard. This we cannot do.

Only one zoning decision is at issue here, a decision which included a determination of the wetlands demarcation line. City challenges the board's action on the basis that no EIR was prepared. This must be reviewed under the substantial evidence test (Pub. Resources Code, § 21168, Code Civ. Proc., § 1094.5, subd. (b).) If application of this test results in the conclusion that an EIR was required, no further review is necessary.

Moreover, it has been held that the stricter standard of substantial evidence is controlling where an agency decision involves both a judicial and a legislative function. (*Mountain Defense League* v. *Board of Supervisors, supra,* 65 Cal.App.3d 723, 729.) In our case the action of the Board exhibited characteristics typical of a quasi-judicial act since it involved a determination of specific rights in regard to a particular factual situation rather than the formulation of broad policy applicable to future situations. (Cal. Administrative Mandamus (Cont.Ed.Bar 1966) § 2.8, p. 17.)

In summary, we conclude that Public Resources Code section 21168 and Code of Civil Procedure section 1094.5, subdivision (b)[4] dictate the correct standard of review for this case. We note that our duties are identical to those of the trial court in that we are required to conduct our own independent review of the entire administrative record. (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 149 [93 Cal.Rptr. 234, 481 P.2d 242]; *Brentwood Assn. for No Drilling, Inc.* v. *City of Los Angeles, supra,* 134 Cal.App.3d 491.)

---

[4]Code of Civil Procedure section 1094.5, subdivision (b): "The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence."

SUBSTANTIVE ISSUES

*Was the Mission Ranch Rezoning a Project and If So, Was An EIR Required?*

A short summary of the purposes and policies of CEQA is in order.[5] CEQA was enacted to preserve and enhance the natural environment of this state by establishing procedures to "[e]nsure that the long-term protection of the environment shall be the guiding criterion in public decisions." (Pub. Resources Code, § 21001, subd. (d).) In the words of our Supreme Court, "'the Legislature intended [CEQA] to be interpreted in such a manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.'" (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 83 [118 Cal.Rptr. 34, 529 P.2d 66], quoting *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049].) Accordingly, "CEQA requires more than merely preparing environmental documents." (Guidelines, § 15002, subd. (h).)

CEQA and the CEQA Guidelines establish a specific process of environmental review which local agencies must follow. Since our concern is whether an EIR should have been prepared rather than the negative declaration, we focus on the "Three Step Process" set forth in the Guidelines by which the agency determines which environmental document to prepare. (Guidelines, § 15002, subd. (k).)

1) *Is the activity subject to CEQA?* An activity is exempt from CEQA if it is not a project under section 15378 of the Guidelines or if "it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment." (Guidelines, § 15061, subd. (b)(1), (3).) A project as defined under section 15378 is "the whole of an action, which has a potential for resulting in a physical change in the environment, directly or ultimately . . . ." If, after preliminary review, the agency determines that the activity is exempt from CEQA, the agency may file a notice of exemption. (Guidelines, §§ 15061, subd. (d), 15062.)

2) *The initial study.* If the activity is a project and is not otherwise exempt from CEQA, the agency must conduct an "initial study" to determine whether the project may have a significant effect on the environment. (Guide-

---

[5]References to the Guidelines throughout this section are to CEQA Guidelines contained in the California Administrative Code, title 14, section 15000 et seq., which are binding on all public agencies. (Guidelines, § 15000.)

lines, §§ 15002, subd. (d)(2), 15063.) There are two possible results of the initial study. "If the agency determines that there is substantial evidence that any aspect of the project, either individually or cumulatively, may cause a significant effect on the environment . . .," it must prepare an EIR, although it can use an existing EIR if one has been prepared which adequately analyzes the project at hand. (Guidelines, § 15063, subd. (b)(1)(A), (B).) If, on the other hand, "the agency perceives no substantial evidence that the project or any of its aspects may cause a significant effect on the environment," the agency may prepare a negative declaration. (Guidelines, §§ 15063(b)(2), 15070(a); Pub. Resources Code, §§ 21080, 21151.)

3) *The EIR process.* If the first result obtains, the agency must then proceed with preparation of an EIR under section 15080 et seq. of the Guidelines, precise details of which process need not concern us here. In general terms the EIR process provides for extensive research and information gathering, consultation with other state, federal and local agencies and with persons or organizations directly concerned, public review and comment, evaluation and response to comments, and detailed findings. (Pub. Resources Code, §§ 21080.3, 21080.4.) Suffice it to say, "the EIR requirement is the heart of CEQA." (Guidelines, § 15003, subd. (a); *San Franciscans for Reasonable Growth* v. *City and County of San Francisco* (1984) 151 Cal.App.3d 61, 72 [198 Cal.Rptr. 634].) The EIR is "an environmental 'alarm bell' whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return" (*County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 810 [108 Cal.Rptr. 377]), and "to demonstrate to an apprehensive citizenry that the agency has in fact analyzed and considered the ecological implications of its action." (*No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d 68, 86.)

▮ Following this three step process we must conclude that the Mission Ranch rezoning was a project and that there was substantial evidence that it might cause a significant effect on the environment. Therefore, preparation of an EIR was mandated.

Mission Ranch argues that the rezoning is not a project under section 15378 of the Guidelines, quoted in part above, since it was not "the whole of an action" but only a preliminary governmental approval with no significant environmental effect. Section 15378, subdivisions (c) and (d) provide: "(c) The term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval. [¶] (d) Where the . . . agency could describe the project as either

the adoption of a particular regulation . . . or as a development proposal which will be subject to several governmental approvals . . . the . . . agency shall describe the project as the development proposal for the purpose of environmental analysis. . . .'' Mission Ranch's interpretation of these sections is that the activity which is a "project" is the development of the property; therefore, the adoption of the rezoning is merely one of the governmental approvals which does not rise to the level of "project" and thus does not merit an EIR.

Public Resources Code section 21080 provides that "enactment and amendment of zoning ordinances" is a discretionary project subject to CEQA. (See also *Rosenthal* v. *Board of Supervisors* (1975) 44 Cal.App.3d 815, 824 [119 Cal.Rptr. 282]; 60 Ops.Cal.Atty.Gen. 335-336 (1977).) Moreover, Mission Ranch's position is not borne out by the cases. In *Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d 247, the first CEQA case to reach our Supreme Court, it was held that the word project includes issuances of permits, leases and other entitlements, in that case a conditional use permit. There followed the case of *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263 [118 Cal.Rptr. 249, 529 P.2d 1017], where the court extended the concept of project to include an annexation of land, even though the annexation itself involved only "governmental paper shuffling" producing no direct environmental effect. "The notion that the project itself must directly have such an effect was effectively scotched in *Friends of Mammoth.* The granting of a conditional use permit—a piece of paper— does not directly affect the environment any more than an annexation approval—another piece of paper."[6] (*Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d at p. 279.) The *Bozung* court stressed the need to consider the cumulative environmental effects of agency action before a project gains irreversible momentum. The annexation was a necessary first step in a chain of events which would culminate in physical impact on the environment; in order to fulfill CEQA requirements, environmental review was mandated "at the earliest possible stage," even though additional EIRs might be required for later phases of the project. (*Id.,* at p. 282.)

The recent case of *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151 [217 Cal.Rptr. 893] (hereafter referred to as *County of Inyo*) involved governmental approval of a general plan amendment and zoning classification on the basis of a negative declaration. The rationale behind the decision was similar to that

---

[6]It is interesting to note that County Supervisor Peters raised a similar point in the hearing on the rezoning, contending that no "building of a stick" was being approved, but that the board was merely approving the "drawing of a line."

advanced by the agency in *Bozung* and rejected by the Supreme Court, namely that preparing an EIR would be premature at the zoning stage since the tentative map for the project, a shopping center, was not before the agency. In *County of Inyo*, when the tentative map was in fact before the board it was again recommended that no EIR was needed since the proposed use now conformed to the existing zoning. The Court of Appeal, citing *Bozung*, found that this approach—division of the project into two parts with "mutually exclusive" environmental documents—was "inconsistent with the mandate of CEQA" and constituted an abuse of discretion. (*Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo*, *supra*, 172 Cal.App.3d at p. 167.)

*County of Inyo* cites section 15378, subdivisions (c) and (d), upon which Mission Ranch relies, interpreting these sections to mean that an agency cannot term each stage of the development "a project" with no significant impact and thereby issue a series of negative declarations when the project as a whole would have required an EIR. In other words, where the project is a development, for which various governmental approvals are necessary, "[a]ll phases of project planning, implementation, and operation must be considered in the initial study of the project" (Guidelines, § 15063, subd. (a)(1)), and an EIR must address all phases.

This interpretation is entirely consistent with *Bozung* which prohibits "piecemeal" environmental review accomplished by "chopping a large project into many little ones—each with a minimal potential impact on the environment—which cumulatively may have disastrous consequences." (*Bozung* v. *Local Agency Formation Com.*, *supra*, 13 Cal.3d 263, 283-284.)

Mission Ranch attempts to distinguish its case from *Bozung* by arguing that its rezoning application was made solely to conform to the LUP and by itself "made no new or expanded commitment to the use of the property," whereas in *Bozung* it was known at the time of the annexation that the annexed land, for the most part agricultural, was targeted for residential, commercial and recreational development. This argument is seemingly inconsistent with the proposition that the rezoning was not a "project" under section 15378 because it was part of a larger project. Moreover, we find the contention that the rezoning was an isolated incident with no significance of its own to be somewhat disingenuous in light of the fact that during the course of the hearings it became evident that development was planned on the Mission Ranch property, for which the rezoning was the first step.[7]

---

[7]After the enactment of a "consistency ordinance" by County, effective January 10, 1984, property owners whose existing use of property was inconsistent with the LUP could simply

When the board of supervisors finally adopted the rezoning and the negative declaration on June 19, 1984, Mission Ranch's development proposal, which would significantly expand the use of the property, had been submitted to County. The board was aware of this. In fact, reference to the proposed development was made in the board's resolution adopting the zoning ordinance.

Thus it appears from the record that the rezoning application was not merely an effort to comply with state law in the abstract, but was a necessary first step to approval of a specific development project. Even if this were not so, the rezoning by itself, contrary to Mission Ranch's assertions, did in fact represent a commitment to expanded use of the property, in addition to finally fixing the size of an environmentally sensitive area. These consequences would appear to qualify it as an activity with "a potential for resulting in a physical change in the environment directly or ultimately" under Guideline 15378. Finally we note that County evidently determined that the rezoning was a project subject to CEQA since it proceeded to prepare its "Environmental Recommendation and Initial Study," step 2 of the "Three Step Process."

In determining the correctness of the second step of the process, whether an EIR or a negative declaration should be prepared, we look to the record for substantial evidence, bearing in mind that we are not allowed to focus simply upon the evidence favoring the administrative decision in disregard of other relevant evidence supporting a contrary position. (*Bixby* v. *Pierno, supra,* 4 Cal.3d 130, 149.) Mission Ranch contends that County's decision to prepare a negative declaration rather than an EIR must stand because it was supported by substantial evidence. This does not accurately describe the inquiry we are to conduct. The case of *Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988 [165 Cal.Rptr. 514] sets forth the scope of our duty of review in no uncertain terms: "[I]f a local agency is required to secure preparation of an EIR 'whenever it can be *fairly argued* on the basis of substantial evidence that the project may have significant environmental impact' [citation], then an agency's adoption of a negative declaration is not to be upheld merely because substantial evidence was

apply for a use permit for the existing use without first applying for rezoning. Thus the application to rezone Mission Ranch was entirely unnecessary for the stated purpose of continuing the existing use and could only be meaningful as a first phase to a residential cluster development. Consequently the "3" of the proposed rezoning was no longer necessary; the final zoning was "R-1-D-S." Nonetheless, as late as the April 25, 1984 hearing, Mission Ranch's representative was insisting publicly that no development of the property was in the offing. On May 18, 1984, a little over a week after the planning commission finally approved the rezoning, Mission Ranch submitted a use permit application to County proposing a development of 61 units.

presented that the project would not have such impact. The . . . court's function is to determine whether substantial evidence supported the agency's conclusion as to whether the prescribed 'fair argument' could be made. If there was substantial evidence that the proposed project might have a significant environmental impact, evidence to the contrary is not sufficient to support a decision to dispense with preparation of an EIR and adopt a negative declaration, because it could be 'fairly argued' that the project might have a significant environmental impact. Stated another way, if the . . . court perceives substantial evidence that the project might have such an impact, but the agency failed to secure preparation of the required EIR, the agency's action is to be set aside because the agency abused its discretion by failing to proceed 'in a manner required by law.'" (*Friends of "B" Street* v. *City of Hayward, supra,* 106 Cal.App.3d at p. 1002.)

As to what constitutes a "significant impact" on the environment, the Guidelines offer some help. An agency "shall consider both primary or direct and secondary or indirect consequences. . . . Secondary consequences . . . may be several steps removed from the project in a chain of cause and effect." (Guidelines, § 15064, subd. (d).) "Indirect or secondary effects may include growth-inducing effects and other effects related to induced changes in the pattern of land use, population density, or growth rate, and related effects on air and water and other natural systems, including ecosystems." (Guidelines, § 15358, subd. (a)(2).)

Furthermore, "[i]n marginal cases where it is not clear whether there is substantial evidence that a project may have a significant effect on the environment, the . . . agency shall be guided by the following factors: . . . [¶] (1) If there is serious public controversy over the environmental effects of a project, the . . . agency shall consider the effect or effects subject to the controversy to be significant and shall prepare an EIR . . . [¶] (2) If there is disagreement between experts over the significance of an effect on the environment, the . . . agency shall treat the effect as significant and shall prepare an EIR." (Guidelines, § 15064, subd. (h).)

Reviewing the record in light of these rules we find substantial credible evidence on the basis of which one might fairly argue that the rezoning of the Mission Ranch property may result in significant environmental impact.

The effect of the zoning ordinance would be twofold: 1) It would authorize expansion of the existing resort hotel use to accommodate residential cluster development; and 2) it would finally define the boundaries of the wetlands area, thereby also fixing the size and maximum density of the developable acreage.

The record contains evidence, both written and oral, from concerned neighbors and other citizens regarding the impact on the surrounding neighborhood of expanded use of the Mission Ranch property, including increased noise, pollution, heavy traffic on streets ill-designed for such use, and other effects of an increase in population density. In addition, residents in the area offered their own observations of the extent of the property which was periodically inundated with water.[8]

The Monterey Peninsula Audubon Society was on record opposing any development beyond the existing use as a threat to the marshland and the riparian habitat along the Carmel river, pointing out that this river stretch floods periodically and persists as a temporary wetland, essential to the vitality of adjacent areas. The society also emphasized the prime importance of the river and lagoon area as a resting and nesting place for migratory birds.

The City was vehement in its opposition to the rezoning. The property is located adjacent to the City, and within its sphere of influence under study at the time by the Local Agency Formation Commission. Expanded use would result in an increased burden on city streets, water and other services. In addition, City stressed that the wetlands on the Mission Ranch property are part of a larger ecosystem; determination of the size of the Mission Ranch wetlands must necessarily take into account the effect on surrounding marshlands and adjacent riparian areas.

Mission Ranch argues that the rezoning should not be considered as sanctioning an expanded use of the property since the maximum number of units allowed under the rezoning would be 65, which is actually less than the 75 unit maximum allowed by the LUP. We are not persuaded by this argument. In assessing the impact of the rezoning, it is only logical that the local agency examine the potential impact on the existing physical environment. The rezoning designation sought by Mission Ranch includes uses which do not presently exist and which would significantly expand the present resort hotel use. This is the effect which must be analyzed. A comparison between what is possible under the LUP and what is possible under the rezoning bears no relation to real conditions on the ground. The rezoning actually calls for substantial increases in population rather than illusory decreases. (*Environmental Planning & Information Council* v. *County of El Dorado* (1982) 131 Cal.App.3d 350, 358 [182 Cal.Rptr. 317].)

---

[8]In the context of an administrative hearing, "relevant personal observations are evidence. For example, an adjacent property owner may testify to traffic conditions based upon personal knowledge." (*Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo, supra,* 172 Cal.App.3d at p. 173.)

In the *El Dorado* case the agency's EIR compared the potential population density allowed under the existing general plan with that allowed under a proposed amendment to the plan, both of which were far higher than the actual population. The court concluded: "The comparisons utilized in the EIRs can only mislead the public as to the reality of the impacts and subvert full consideration of the actual environmental impacts which would result. There are no extensive, detailed evaluations of the impacts of the proposed plans on the environment in its current state. Accordingly, the EIRs fail as informative documents." (*Ibid.*) The fact that County was following state law by conforming zoning to the LUP (Gov. Code, § 65860) does not by itself excuse preparation of appropriate environmental documents.

In addition to the public controversy generated by the proposed rezoning, there was substantial disagreement among the experts regarding the size of the wetlands. The initial wetlands survey, conducted by Dr. Fox and submitted with the original rezoning application, concluded that the wetlands comprised 4.68 acres. Dr. Tom Harvey, a botanist employed by City, urged inclusion of the riparian corridor and a transition zone in the final determination of wetlands. His total was 9.1 acres. Dr. Robert Curry, a hydrologist also employed by City, figured the wetlands area according to the prevailing water table, and concluded that the wetlands included 11.9 acres.[9] Nona Dennis, an impartial expert selected by County, met with the other experts, reviewed all available reports, toured the site, and recommended further more comprehensive studies, including a wildlife survey "to clarify the functional relationships between the pasture, that contains wetland vegetation, and wildlife from adjacent riparian and lagoon salt marsh habitats." These additional surveys were not carried out.

The staff of the County planning department, while acknowledging that there was a "fair amount of . . . dispute . . . between the different experts as to what constitutes wetlands and what is developable and what isn't developable," finally recommended adoption of the Fox delineation of 4.68 acres, plus the flowing river channel comprising 1.46 acres, for a total of 6.14 acres to be zoned "O."

The definition of wetlands in the LUP, which is identical to that contained in the Coastal Act, unfortunately did not provide a meaningful standard. This definition reads: "Wetlands are defined as lands which may be covered periodically or permanently with shallow water and include saltwater marshes, fresh water marshes, open or closed brackish water marshes, swamps, mudflats and fens."

[9] Dr. Curry's approach, not surprisingly, was debunked by Mission Ranch's hydrologist, Dr. Ray Lindsley, who advocated the Fox demarcation line.

Although this may adequately describe wetlands in the layman's mind, the experts were unanimous that the LUP definition was unworkable for field study purposes. Periodic flooding in itself does not qualify an area as wetlands. There must be present at least one of two other indicators: wetlands soil types or vegetation. Apparently the area in question is too young geologically to yield wetlands soil types. Therefore, all of the surveys, with the exception of Dr. Curry's, concentrated on the presence of various vegetation types generally agreed to be indicative of wet marshy areas.

City claims that this digression from the letter of the LUP definition was a failure by County to follow the law. It is clear, however, that the definition quoted above was inadequate for the task at hand—determining the actual boundary of the lands described as wetlands. Another section of the LUP provides a more scientific basis for such a determination. "The edge of wetlands shall be pursuant to policy 2.3.3.5, based on the wetlands definition in policy 2.3.3.1 and using the U.S. Fish and Wildlife Service's classification of Wetlands and Deep Water Habitats of the United States."[10] There was general consensus among the experts that the U.S. Fish and Wildlife Service classification "is the most definitive system available and is preferred by California Department of Fish and Game wetland biologists," and the various field surveys of the property, with the exception of the hydrologist's, were based on this standard.

Nonetheless disagreement persisted. According to Dr. Harvey, the U.S. Fish and Wildlife Service's definition includes riparian lands as wetlands. He, and in his opinion most experts, would also do so. A local biologist and ornithologist, Michael Kelly, endorsed this approach. Dr. Fox testified that she did not include the riparian corridor in her study because she was not asked by Mission Ranch to evaluate that area. The County's expert, Nona Dennis, while not commenting specifically on inclusion of the riparian area as part of the wetlands, recommended that studies of surrounding habitats be carried out before a final determination was reached.

Other areas of dissension among experts were the grazing land adjacent to the wetlands, where, Dr. Harvey maintained, wetlands vegetation would grow if grazing ceased, and a transition area, where wetlands vegetation was sparse but nonetheless present. Another factor to be taken into account was whether the berm closing the river mouth was regularly dredged.

Mission Ranch argues that the LUP definition of wetlands does not include riparian land. Further, the LUP clearly differentiates between wetlands and

[10]Section 2.3.3.5 provides that field surveys by qualified individuals or agencies be required in order to determine precise locations of the habitat, and 2.3.3.1 is the wetlands definition quoted above.

riparian lands, providing for different treatment for each. This may be so; however, U.S. Fish and Wildlife specifications, endorsed by the LUP as the means of determining the edge of wetlands, would apparently include riparian areas as wetlands where the two overlap.

Moreover, the LUP provides that the County "should work in coordination with the Department of Fish and Game, federal government agencies (e.g., Fish and Wildlife Service), and local botanists to develop effective conservation easements, associated means of implementation and enforcement procedures to protect sensitive plants and critical habitat locations." The district supervisor for the Fish and Wildlife Service, Bruce Elliot, appeared at the initial environmental hearing before the planning commission, as well as at the final meeting, and expressed concern about the continuing disagreement over the definition of the wetlands. No official study as to the extent of the wetlands was solicited from his agency, but it was thought that Elliot's opinion of the area involved was closer to Curry's (11.9 acres) than Fox's (4.68 acres).

It is not within the scope of our review to make a determination as to the correct application of the LUP to the problem of wetlands determination. We simply note that the record reflects an unresolved factual dispute. "In such cases, an EIR—an impartial, detailed and factual analysis of the project's effect—can perform an invaluable service in aiding the agency's resolution of the dispute. . . . 'The very uncertainty created by the conflicting assertions made by the parties . . . underscores the necessity of the EIR to substitute some degree of factual certainty for tentative opinion and speculation.'" (*No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d 68, 85.)

*Does a Subsequent EIR Suffice to Comply with CEQA?*[11]

This second issue, essentially involving the timing of the EIR, necessarily addresses some of the same questions discussed above in regard to Step 1 of the "Three Step Process." Mission Ranch's position can be stated as follows. An EIR at the zoning stage would not be feasible. Environmental impacts would be too speculative and mitigation measures could not be given meaningful consideration. An EIR at the development stage on the other hand will adequately address environmental issues and also avoid needless delay and redundancy. This position is advanced in the face of a mass of authority following *Bozung* v. *Local Agency Formation Com., supra,*

---

[11]We note that the trial court properly refused to admit this EIR into evidence, since it was not part of the administrative record. (*Brentwood Assn. for No Drilling, Inc.* v. *City of Los Angeles, supra,* 134 Cal.App.3d 491.)

13 Cal.3d 263.[12] In that case, as discussed above, our Supreme Court held that an EIR must be prepared "at the earliest possible stage," even though additional EIRs might be required for later phases of the project.

■ The fact that the environmental consequences of a rezoning may be more amorphous than those flowing from a precise development plan does not compel the conclusion that no EIR is required. The CEQA guidelines recognize that an EIR for zoning purposes will necessarily be less detailed than one prepared for a specific construction project. Guidelines section 15146, subdivision (b) provides that "[a]n EIR on a project such as the adoption or amendment of a comprehensive zoning ordinance . . . should focus on the secondary effects that can be expected to follow from the adoption . . . but the EIR need not be as detailed as an EIR on the specific construction projects that might follow." In addition, Guideline section 15152 endorses "tiering" EIRs so that later EIRs at subsequent phases of a project need not repeat material contained in earlier documents. Thus the difficulty of assessing future impacts of a zoning ordinance does not excuse preparation of an EIR; such difficulty only reduces the level of specificity required and shifts the focus to the secondary effects.

Mission Ranch argues that the rule set down in *Bozung* has been modified in recent years. In the case of *No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d 68, decided a month before *Bozung,* the Supreme Court in a footnote cited a federal case: "'Thus we are pulled in two directions. Statements must be written late enough in the development process to contain meaningful information, but they must be written early enough so that whatever information is contained can practically serve as an input into the decision making process.'" (*Scientists' Inst. for Pub. Info., Inc.* v. *Atomic Energy Com'n.* (D.C. Civ. 1973) 481 F.2d 1079, 1094; *No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d at p. 77, fn. 5.) In another Supreme Court case, *Fullerton Joint Union High School Dist.* v. *State Bd. of Education* (1982) 32 Cal.3d 779 at page 797 [187 Cal.Rptr. 398, 654 P.2d 168], the court noted that "[t]he timing of an environmental study can present a delicate problem," citing footnote 5 from the *No Oil* case.

Language similar to footnote 5 was thereafter added to the Guidelines in 1983 in new section 15004: "[¶] (b) Choosing the precise time for CEQA

---

[12]*Markley* v. *City Council* (1982) 131 Cal.App.3d 656 [182 Cal.Rptr. 659]; *McCarthy* v. *California Tahoe Regional Planning Agency* (1982) 129 Cal.App.3d 222 [180 Cal.Rptr. 866]; *Brentwood Assn. for No Drilling, Inc.* v. *City of Los Angeles, supra,* 134 Cal.App.3d 491; *Rosenthal* v. *Board of Supervisors, supra,* 44 Cal.App.3d 815, 824; *People* ex rel. *Younger* v. *Local Agency Formation Com.* (1978) 81 Cal.App.3d 464, 475-476 [146 Cal.Rptr. 400]; *Pistoresi* v. *City of Madera* (1982) 138 Cal.App.3d 284, 287 [188 Cal.Rptr. 136].

compliance involves a balancing of competing factors. EIRs and negative declarations should be prepared as early as feasible in the planning process to enable environmental considerations to influence project program and design and yet late enough to provide meaningful information for environmental assessment.''

Mission Ranch argues that section 15004 gives the local agency complete discretion in determining when to prepare the EIR, and that there is substantial evidence in the record to support County's exercise of this discretion. We do not agree. In the first place, section 15004 does not displace the three step process, "the heart of CEQA." Where a project may have a significant effect on the environment, an EIR must be prepared. Where a project has several phases an EIR must be prepared which covers *all* phases (*Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo, supra,* 172 Cal.App.3d 151; Guidelines, § 15063, subd. (a)(1).) The agency simply cannot choose to prepare an EIR on a later phase of a project while ignoring an earlier phase.

Moreover, the application of the substantial evidence test is well established in this field. (See *Friends of "B" Street* v. *City of Hayward, supra,* 106 Cal.App.3d 988.) It applies to determine whether adverse environmental impacts of a project can be fairly argued. If so, the agency abuses its discretion in failing to prepare the EIR.

We note that in both *Fullerton* and *No Oil,* as well as in *Bozung,* the Supreme Court decided in favor of the EIR at an early stage. In fact Mission Ranch has cited us to no case representing a significant erosion of the *Bozung* rule.

At the board of supervisors meeting on June 19, 1984, it was evident that the supervisors were under the impression that the later EIR would suffice to address environmental issues which had arisen regarding the rezoning. The board specifically found as follows: "That the preparation of an EIR for the proposed project for this site is in progress, and that the evidence for that is the testimony of the Environmental Planner; and that the EIR covers all of the issues raised by the City of Carmel-by-the-Sea in their letter that were potential environmental impacts of the proposed project which is not before the Board at this time."

The negative declaration adopted by the board, however, terminates environmental review on the subject of the rezoning. A later EIR regarding a development project on the property would treat the zoning as a fait

accompli, and would not need to address either the density designation or the definition and demarcation of the wetlands.

In determining whether to approve a rezoning of this environmentally critical area, the board was entitled to have the benefit of all relevant environmental data and analysis. (See *Fullerton Joint Union High School Dist.* v. *State Bd. of Education, supra,* 32 Cal.3d at p. 798.) Adopting the zoning ordinance with only a negative declaration on the basis that an EIR was being prepared covering the development phase of the project resulted in the omission of vital information by use of two "mutually exclusive" environmental documents. (*Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo, supra,* 172 Cal.App.3d at p. 167.) This amounts to a subversion of the purposes of CEQA. (*Rural Landowners Assn.* v. *City Council* (1983) 143 Cal.App.3d 1013 [192 Cal.Rptr. 325].)

### Was the LUP the Certified Equivalent of an EIR?

Mission Ranch relies on section 15002, subdivision (1) of the Guidelines in support of its claim that the LUP was the certified equivalent of an EIR for purposes of rezoning the Mission Ranch property. This section provides as follows: "Certified Equivalent Programs. A number of environmental regulatory programs have been certified by the Secretary of the Resources Agency as involving essentially the same consideration of environmental issues as is provided by use of EIRs and negative declarations. Certified programs are exempt from preparing EIRs and negative declarations but use other documents instead. Certified programs are discussed in Article 17 and are listed in Section 15251." Section 15251 lists, among others, as a certified program: "(f) The program of the California Coastal Commission involving the preparation, approval, and certification of local coastal programs as provided in section 30500 through 30522 of the Public Resources Code."

The LUP is the local coastal program for the entire Carmel area. Mission Ranch points out that preparation of the LUP involved analysis of the Mission Ranch property with the result that the property was specifically identified and given special treatment in the LUP. In particular, the LUP provided that Mission Ranch (or its successors) could continue the existing use and if the existing use were abandoned could construct a cluster residential development not to exceed 75 units, with the provision that the wetlands be preserved and protected. Since Mission Ranch's rezoning proposed to do nothing more than follow the policies laid down in the LUP, it is argued that a further EIR would be duplicative.

Again, we must disagree. We interpret the sections quoted above to mean only that the process of preparation of the local coastal program (the LUP) itself does not require an EIR. The rezoning of a particular parcel, however, even if the result conforms with the plan, is a different matter, which necessarily requires a more detailed analysis. Although the plan set forth the parameters of allowed density (two to six units per acre), the rezoning fixed this figure at 4.5. And while the plan expressed the general intent to preserve the wetlands as open space, the zoning decision attempted to grapple with the task of fixing the boundaries of the open space area. A different level of scrutiny is required when specific lines are finally drawn.

Our interpretation is consistent with Public Resources Code section 21080 which provides that CEQA does not apply where a local agency is implementing a regulation under a certified program, *except* that "[a]ny site-specific effect of the project which was not analyzed as a significant effect in the plan or other written documentation required by Section 21080.5 is subject to [CEQA]."

In order to qualify as a functional equivalent of an EIR, the document issued by the certified program must be prepared in strict accordance with a regulatory scheme which includes "mitigation measures available to minimize any significant environmental impact . . .; consultation by the agency with other public officers and agencies . . .; notice to the public and opportunity for public review and comment . . .; written responses by the agency to 'significant environmental points raised during the evaluation process' . . .; and a requirement that a project be disapproved if there are feasible alternatives to the proposed action which 'would substantially lessen any significant adverse impact' on the environment . . . ." (Pub. Resources Code, § 21080.5; *Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 196 [132 Cal.Rptr. 377, 553 P.2d 537].)

It is obvious that this analysis must be made, and a document issued, with respect to the specific project under consideration. For example, the permit process of the Coastal Commission is a certified program; thus a coastal development permit issued by this agency suffices as the functional equivalent of an EIR on the same project. (Guidelines, § 15251, subdivision (f).)

In our case, however, there was no such document prepared regarding the rezoning of the Mission Ranch property. ■ Although the LUP discussed the property, its focus was on the entire Carmel area. It does not address specific environmental effects arising from the rezoning. Therefore, the LUP cannot function as the equivalent of the required EIR.

## ATTORNEY'S FEES

Carmel claims attorney's fees in its capacity as private attorney general under two theories: (1) The inherent equitable power of the court as expressed in *Serrano* v. *Priest* (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303]; and (2) Code of Civil Procedure section 1021.5 which provides express statutory authority for a grant of attorney's fees.

The criteria to be considered for such a grant of attorney's fees, essentially the same in *Serrano* and Code of Civil Procedure section 1021.5, are: (1) whether there has been enforcement of important public policy which confers a benefit on the general public or on a large class of people; and (2) whether the necessity and financial burden of private enforcement justifies the award.[13]

Code of Civil Procedure 1021.5 adds one important limitation, which is not mentioned in *Serrano*: "With respect to actions involving public entities, this section applies to allowances *against, but not in favor of,* public entities, . . . ." (Italics added.)

It is well settled that the private attorney general theory applies to an action to enforce provisions of CEQA. (*Rich* v. *City of Benicia* (1979) 98 Cal.App.3d 428 [159 Cal.Rptr. 473]; *Friends of "B" Street* v. *City of Hayward, supra,* 106 Cal.App.3d 988; *Starbird* v. *County of San Benito* (1981) 122 Cal.App.3d 657 [176 Cal.Rptr. 149]; *Twaine Harte Homeowners Assn.* v. *County of Tuolumne* (1982) 138 Cal.App.3d 664 [188 Cal.Rptr. 233]; *San Bernardino Valley Audubon Society, Inc.* v. *County of San Bernardino* (1984) 155 Cal.App.3d 738 [202 Cal.Rptr. 423].)

The question is whether City, as a public entity, is precluded by section 1021.5 from receiving attorney's fees.

City argues that the quoted provision in section 1021.5 applies only where entities are involved in their official capacities as for example in *People* ex rel. *Cooper* v. *Mitchell Brothers' Santa Ana Theater* (1985) 165 Cal.App.3d 378 [211 Cal.Rptr. 501], where the action was instituted by the city attorney in his capacity as a government officer to abate a public nuisance. In our case City hired a private attorney and asserts in its brief that it filed a private action to enforce the provisions of CEQA for the benefit of "all of the residents of Monterey County." But its writ petition is brought in the name

---

[13]Code of Civil Procedure section 1021.5 lists a third criterion—that fees should not be paid out of the recovery—which is not applicable here.

of City-of-Carmel-by-the-Sea, "a Municipal Corporation," and alleges injuries only to City and its residents.

Unfortunately, the two environmental cases decided since the enactment of section 1021.5 where plaintiffs have been public entities did not apply the statute, denying attorney's fees on other grounds. (*County of Inyo* v. *City of Los Angeles* (1978) 78 Cal.App.3d 82 [144 Cal.Rptr. 71]; *San Francisco Unified School Dist.* v. *State of California* (1982) 131 Cal.App.3d 54 [182 Cal.Rptr. 525].)

City relies upon the case of *Folsom* v. *Butte County Assn. of Governments* (1982) 32 Cal.3d 668 [186 Cal.Rptr. 589, 652 P.2d 437], wherein the Supreme Court addressed the question whether fees may be awarded under section 1021.5 to legal services groups funded primarily by public monies. In that case defendants argued that plaintiffs did not incur personal liability because the legal services agencies representing them were largely funded with public monies, and further that a fee award benefitting such agencies would contravene section 1021.5. Defendants urged that legal services groups be deemed public entities under the statute. The Supreme Court declined to interpret the statute in that manner, noting that "an award to lawyers who have vindicated an important interest achieves the desired result whether they worked for a private firm or a legal services organization." (*Id.*, at p. 683.) Thus the *Folsom* case simply holds that section 1021.5 does not apply to bar attorney's fees awards to publicly funded legal services groups. Our case is therefore unaffected by *Folsom* since we are concerned with a public entity to which the statute specifically does apply.

It is an axiom of statutory interpretation that if no ambiguity, uncertainty, or doubt about the meaning of a statute appears, the provision is to be applied according to its terms without further judicial construction (*Morse* v. *Municipal Court* (1974) 13 Cal.3d 149, 156 [118 Cal.Rptr. 14, 529 P.2d 46]). ■ The Legislature must therefore be held to have determined that a public entity is not to receive attorney's fees under the private attorney general theory.

Section 1021.5 was signed into law four days before the opinion in *Serrano* was filed. Each derived from the same body of law[14] and each enumerated essentially the same criteria giving rise to a right to attorney's fees. City takes the position that *Serrano* created an independent entitlement to at-

---

[14]The private attorney general doctrine was grounded largely in federal case law as it existed prior to the Supreme Court decision in *Alyeska Pipeline Co.* v. *Wilderness Society* (1975) 421 U.S. 240 [44 L.Ed.2d 141, 95 S.Ct. 1612].

torney's fees which exists separately from the statutory right and without its express limitation. We find nothing in *Serrano* to support this proposition; moreover, were we to give it effect here we would override a categorical mandate of the California Legislature.

The trial court denied fees on the basis that City "failed to prove the interest to the public versus its own interests as a municipality." While this finding is borne out by the writ petition itself, we rest our affirmance of the order squarely on the unequivocal language of Code of Civil Procedure section 1021.5.

The judgment and order are affirmed.

Agliano, P. J., and Phillips, J.,* concurred.

Petitions for a rehearing were denied July 25, 1986, and the petition of plaintiff and appellant for review by the Supreme Court was denied September 24, 1986.

*Assigned by the Chairperson of the Judicial Council.